# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

—————————————

**No. ACM 38991 (reh)**

—————————————

**UNITED STATES**
*Appellee*

**v.**

**Frank M. VARGAS**
Senior Airman (E-4), U.S. Air Force, *Appellant*

—————————————

Appeal from the United States Air Force Trial Judiciary

Decided 14 January 2022

—————————————

*Military Judge:* Christopher T. Fredrikson, U.S. Army (rehearing).[1]

*Approved sentence:* Dishonorable discharge, confinement for 13 years, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 31 January 2019 by GCM convened at Spangdahlem Air Base, Germany.

*For Appellant:* Captain Brian L. Mizer, USN;[2] Major Benjamin H. DeYoung, USAF.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Major Kelsey B. Shust, USAF; Mary Ellen Payne, Esquire; Jordan E. Michel (legal intern).[3]

Before JOHNSON, POSCH, and RICHARDSON, *Appellate Military Judges.*

Senior Judge POSCH delivered the opinion of the court, in which Chief Judge JOHNSON and Judge RICHARDSON joined.

—————————————

[1] An Army military judge was detailed to this case due to involvement by the Chief Trial Judge of the Air Force in Appellant's original court-martial.

[2] Captain (CAPT) Mizer, United States Navy (USN), is a civilian attorney assigned to the Air Force Appellate Defense Division, and a USN reserve judge advocate.

[3] Mr. Michel was supervised by an attorney admitted to practice before the court.

————————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————————

POSCH, Senior Judge:

Appellant's case is before the court a second time. At his first trial in September 2015, a general court-martial composed of officer and enlisted members found Appellant guilty, contrary to his pleas, of two specifications of attempted abusive sexual contact, three specifications of sexual assault, one specification of abusive sexual contact,[4] and two specifications of assault consummated by a battery, in violation of Articles 80, 120, and 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 880, 920, 928.[5] The adjudged and approved sentence consisted of a dishonorable discharge, confinement for 29 years, and reduction to the grade of E-1.

In the court's initial review, we set aside the findings of guilty and the sentence, concluding that the military judge, Judge DE, who presided at the court-martial abused his discretion in denying a defense motion to recuse. *United States v. Vargas*, No. ACM 38991, 2018 CCA LEXIS 137, at *3, 28 (A.F. Ct. Crim. App. 15 Mar. 2018) (unpub. op.). The court reached this result because Judge DE was a potential witness with personal knowledge of disputed evidentiary facts relevant to a defense motion. *Id.* at *21. The court found Judge DE had knowledge about an alleged concerted effort by government actors to remove another judge, Judge CL, from courts-martial involving Article 120, UCMJ, allegations, including Appellant's case, to which Judge CL initially had been detailed. *Id.* at *18–20, 23–24.

The removal of Judge CL was at the center of Appellant's motion to dismiss the charges at his original court-martial on the basis of unlawful command influence (UCI). *Id.* at *7. Judge DE found there was sufficient evidence of UCI to shift the burden to the Government to disprove UCI had occurred. *Id.* at *15. Judge DE ruled that he was convinced beyond a reasonable doubt that the evidence did not constitute UCI and denied the motion. *Id.* at *12–16. However,

———————————————

[4] The court's first opinion incorrectly states Appellant had been found guilty of *two* specifications of abusive sexual contact. *See United States v. Vargas*, No. ACM 38991, 2018 CCA LEXIS 137, at *1 (A.F. Ct. Crim. App. 15 Mar. 2018) (unpub. op.).

[5] Except where indicated, references to the punitive articles of the UCMJ and the Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2012 ed.) (2012 *MCM*). Except where indicated, other references to the UCMJ are to the *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*).

the court did not decide the merits of that issue in our initial review because we found that Judge DE's impartiality could be reasonably questioned:

> [B]ased on the facts before us, where there was substantial evidence of an alleged concerted effort to have [Judge CL] removed based on disagreement with his actions in a certain class of cases, and the subsequent removal of [Judge CL] from several cases within that class, Appellant's UCI motion required an arbiter who was neutral and detached, both apparently and in fact, and the military judge[, Judge DE, who presided at Appellant's trial and sentencing in September 2015] did not qualify as such.

*Id.* at *23–24. In the exercise of our authority under Article 66, UCMJ, 10 U.S.C. § 866, the court set aside the findings of guilt and the sentence, and authorized a rehearing. *Vargas*, 2018 CCA LEXIS 137, at *25, 28.

After the case was returned to the convening authority, Appellant was retried with Judge Christopher T. Fredrikson,[6] United States Army, presiding as the military judge. At a rehearing that concluded in January 2019,[7] a general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of three offenses. One offense was the sexual assault of a female German national in violation of Article 120, UCMJ. After committing this offense, Appellant pulled the victim's head and neck toward his penis, which was the basis for Appellant's conviction for attempted abusive sexual contact of the same victim in violation of Article 80, UCMJ. Appellant was found guilty of a second violation of Article 120, UCMJ, for a separate incident one week later when evidence showed he sexually assaulted a female Airman. Another specification of sexual assault that alleged an offense against a second Airman was withdrawn and dismissed after arraignment. During the rehearing, the military judge entered a finding of not guilty to another specification of sexual assault. In addition to these findings, the members found Appellant not guilty of one specification of attempted abusive sexual contact in violation of Article 80, UCMJ, and not guilty of two specifications of assault consum-

---

[6] Except where indicated, "military judge" in this opinion refers to Judge Fredrikson.

[7] Appellant was arraigned on 20 August 2018. The court-martial convened on 28 September 2018, 13–14 November 2018, 11–13 December 2018, 22–26 January 2019, and 28–31 January 2019.

mated by a battery in violation of Article 128, UCMJ. The adjudged and approved sentence consisted of a dishonorable discharge, confinement for 13 years, forfeiture of all pay and allowances, and reduction to the grade of E-1.[8]

Following the rehearing and in this appeal, Appellant renews his allegation that the removal of Judge CL from Appellant's case was the result of unlawful influence. Appellant raises five issues on appeal, two of which are assignments of error raised through appellate counsel: (1) whether the military judge who presided at the rehearing "erred in denying the defense motion to dismiss for unlawful command influence [UCI];"[9] and (2) whether the evidence is legally and factually sufficient to support Appellant's conviction for sexual assault of the female Airman.[10] In addition, Appellant personally raises three issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982): (3) whether the military judge erred in denying the defense motion to dismiss for unreasonable multiplication of charges; (4) whether there was prosecutorial misconduct in the cross-examination of Appellant; and (5) whether there was improper prosecutorial argument in findings and sentencing. In addition to these issues, we address the issue of timely appellate review.

The court considered the three issues Appellant personally raises pursuant to *Grostefon* and determines they are without merit and warrant no relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). After considering Appellant's assignments of error and issues he personally raises on appeal, we find no error that materially prejudiced a substantial right of Appellant and affirm the findings and sentence.

# I. BACKGROUND

After a contested rehearing in which Appellant testified in his own defense, Appellant was convicted of committing three offenses against two women in October 2013. Evidence showed Appellant committed the offenses when he was off duty and assigned to an air base in Germany.

---

[8] The convening authority ordered a total of 1,428 days confinement credit for time served under the original court-martial sentence, and for illegal pretrial punishment (357 days) and restriction tantamount to confinement (76 days).

[9] The court understands Appellant's assignment of error to encompass alleged *unlawful influence* on the part of government actors. In that regard, claims of unlawful influence from non-command sources are evaluated by the same standard used to evaluate "abuses perpetrated by those in command or those acting with the mantle of command authority." *United States v. Barry*, 78 M.J. 70, 76–77 (C.A.A.F. 2018).

[10] Appellant's assignment of error challenges the evidentiary sufficiency of Specification "3" of Charge II, which was enumerated "4" until the convening authority withdrew and dismissed another specification under Charge II after arraignment.

On appeal, Appellant does not challenge the evidentiary sufficiency of two convictions as they relate to a 19-year-old German woman. Appellant befriended the woman at an Oktoberfest celebration in Wittlich, Germany. At night and after they had been drinking beer in the main tent, Appellant took the woman by the hand and led her outside behind a row of trailers where food was prepared for the festival. The woman protested when Appellant pushed her down on a stack of wooden pallets and penetrated her vagina with his penis. In time, Appellant stepped back and allowed the woman to get up, which is when she noticed her underwear and pantyhose had come off. As she felt around on the ground for her clothes, Appellant grabbed the woman by the neck and pulled her toward his penis. Appellant's conduct with the woman in Wittlich was the basis for his convictions for sexual assault and attempted abusive sexual contact.

One week after his conduct on the Oktoberfest grounds, evidence showed Appellant sexually assaulted a female Airman, WN. On appeal, Appellant challenges the legal and factual sufficiency of this conviction. Before the incident in question, Appellant, WN, and a group of their peers went to a club in Koblenz, Germany. After they left the club, evidence showed Appellant had sexual intercourse with WN on the hood of a parked car. Appellant was convicted of penetrating WN's vulva with his penis when she was incapable of consenting to the sexual act because of impairment by alcohol.

In this decision, we address Appellant's allegation of unlawful influence as relates to the removal of Judge CL from presiding at Appellant's original court-martial. We begin with Appellant's contention that the military judge who presided at the rehearing erred in denying the defense motion to dismiss for UCI. We then examine the legal and factual sufficiency of Appellant's conviction for sexual assault of WN and the issue of timely appellate review.

## II. DISCUSSION

### A. Allegation of Unlawful Influence

Appellant was previously tried, convicted, and sentenced on the same charges under review. Those allegations were referred to trial by general court-martial in 2014 by the commander, Third Air Force (3 AF),[11] at Ramstein Air Base, Germany. They included the identical sexual assault and attempted abusive sexual contact specifications of which Appellant was again convicted and that are germane to this appeal.

---

[11] Following service convention, this opinion quotes witnesses who refer to Third Air Force as "3 AF," and to the command's legal staff as "3 AF/JA."

When the case was referred in 2014, Judge CL was one of two military judges assigned to the Air Force Trial Judiciary in Europe. The other was Judge CL's immediate supervisor, Judge DE, who was the Chief Regional Military Judge in Europe. Like the small footprint of military judges assigned to that region, just two senior trial counsel and two special victims' counsel were stationed in Europe. Time and again, these judge advocates appeared in the same cases and before the same two military judges at Air Force installations throughout the United States Air Forces in Europe (USAFE).

Appellant's case was docketed for trial at Spangdahlem Air Base, Germany, on 17 October 2014, with Judge CL detailed to preside as the military judge. Three days later, Judge CL issued a scheduling order to counsel for both parties. This was the only action Judge CL took in the case[12] before Chief Judge VS, the Chief Trial Judge of the Air Force, removed Judge CL from the case later the next month.

During the relevant period, Judges DE and CL were in the supervisory chain of Chief Judge VS. In late November 2014, Chief Judge VS removed Judge CL from Article 120, UCMJ, cases except one case in which Judge CL already appeared on the record. The reason Chief Judge VS gave for his decision were incidents of Judge CL's incivility and temperament on the bench.[13] As it happens, the conduct of just one trial counsel, a senior trial counsel (the STC) who was also stationed in Europe, was especially apt to provoke rebukes from Judge CL. After Chief Judge VS removed Judge CL from Appellant's court-martial, Judge DE detailed himself as the presiding military judge.

The decision to remove Judge CL was contested before Appellant's original trial. Appellant moved Judge DE to recuse himself because he had personal knowledge of disputed evidentiary facts about the proceeding, specifically, knowledge of why Chief Judge VS removed Judge CL from trying his case. At the same time, Appellant identified actions and statements by judge advocates that he believed violated his right to a court-martial free of unlawful influence. In a pretrial motion to dismiss the charges with prejudice, Appellant claimed

---

[12] Judge CL testified at the rehearing. In response to the question, "[D]id you make any decisions based on legal issues presented to you in the *United States v. Vargas* case?" he answered, "No."

[13] As Appellant points out in his brief, two days before the case was docketed for trial, Chief Judge VS announced a "Judicial Performance Review" (JPR). The results of the JPR established Judge CL earned excellent marks for his integrity and impartiality. A court reporter who had worked with Judge CL the most gave him perfect scores. At the same time, a respondent, identified as a staff judge advocate, claimed "[t]here is a strong perception in USAFE that Judge [CL] is not impartial when it comes to sexual assault prosecutions."

Chief Judge VS's decision was motivated by a desire to placate judge advocates who wanted a defense-friendly judge removed from sexual assault cases such as his own. Judge DE denied both motions, and Appellant was tried, convicted, and sentenced as described above.

Following the court's 15 March 2018 decision that set aside the findings and the sentence, Appellant's case was returned to the convening authority at Third Air Force. In response to a request from the convening authority's staff judge advocate (SJA), the Army Chief Trial Judge identified an Army military judge to be detailed to preside at Appellant's rehearing.

Before the rehearing, Appellant renewed his contention that judge advocates had unlawfully influenced Chief Judge VS's decision to remove Judge CL from Appellant's case, and, in doing so, had undermined public confidence in the military justice system administered in the Air Force. His principal contention in the pretrial motion was that actual unlawful influence worked to manipulate Chief Judge VS's decision as to which military judge would be detailed to try his case. At the same time, Appellant maintained that an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor significant doubt about the fairness of Appellant's original court-martial and subsequent rehearing. As a remedy, Appellant entreated the military judge to dismiss with prejudice the charges and specification, asserting "[a]ny other remedy continues to deprive [Appellant] of his constitutional and statutory rights, and allows the Government to continue benefiting from its unlawful goal of removing a qualified military judge without sanction."

The military judge denied the motion and Appellant renews his allegation of actual and apparent unlawful influence in this appeal.

### 1. Findings of Fact

The incidents that give rise to Appellant's allegations of actual and apparent unlawful influence occurred before Appellant's original court-martial in 2015. To decide the matter, we accord deference to the military judge's findings of fact[14] and include them with the court's own factfinding as follows.[15]

#### a. Events Preceding Judge CL's Removal from Appellant's Case

A suitable place to begin is with a summary of three cases, *United States v. Bowser*, *United States v. Miller*, and *United States v. Jay*. Judge CL had either

---

[14] Our review of the military judge's factfinding was enhanced by his identifying the paragraphs in the pleadings that contained statements of facts adopted in his ruling.

[15] *See, e.g.*, *United States v. Cendejas*, 62 M.J. 334, 342 (C.A.A.F. 2006) (citing Article 66(c), UCMJ, 10 U.S.C. § 866(c)) ("Unlike most intermediate appellate courts and [the CAAF], the Court of Criminal Appeals has factfinding powers.").

presided over these cases as the military judge (*Bowser* and *Jay*), or as the investigating officer (IO) (*Miller*) appointed under Article 32, UCMJ, 10 U.S.C. § 832 (*Manual for Courts-Martial, United States* (2012 ed.) (2012 *MCM*)). The following explains these cases as they bear on Chief Judge VS's decision to remove Judge CL from presiding at Appellant's original court-martial.

### i) United States v. Bowser

In June 2014, Judge CL dismissed with prejudice the charges in the court-martial of *United States v. Bowser. See United States v. Bowser*, 73 M.J. 889, 891–95 (A.F. Ct. Crim. App. 2014), *aff'd*, 74 M.J. 326 (C.A.A.F. 2015). The Government filed an interlocutory appeal under Article 62, UCMJ, 10 U.S.C. § 862 (2012 *MCM*), which this court denied, finding that Judge CL did not abuse his discretion in dismissing with prejudice the charges and specifications in that case. *Id.* at 903. As found by this court, the STC who was the lead prosecutor in *Bowser* defied Judge CL's order to disclose trial counsel's witness interview notes for in camera review following defense claims of a discovery violation. *Id.* at 902–03. Although the STC initially offered to provide his notes to Judge CL for in camera review, the Government later changed its position, responding that it would not disclose his notes "on the advice of our supervisors and JAJG."[16] *Id.* at 893.

Before Judge CL dismissed the charges in *Bowser*, the STC had discussed with judge advocates assigned to JAJG about moving Judge CL to recuse himself on the basis of rulings he made in that case that were adverse to the Government. During a discussion with JAJG leaders, the STC came to believe that Judge CL had a past personal experience that caused him to be biased in certain Article 120, UCMJ, cases. The STC and the JAJG leadership at the time thought the experience might be relevant to a recusal motion because a similar circumstance existed in the *Bowser* case. After Judge CL's ruling in *Bowser*, the JAJG deputy director sent out an email to the STC community that maligned Judge CL as a "weak judge" who had "abandon[ed] his role as a detached arbiter and became an agent of the defense."[17]

Chief Judge VS first learned about Judge CL's ruling in *Bowser* when the Chief Regional Military Judge in Europe[18] contacted Chief Judge VS to let him

---

[16] JAJG is the Air Force Government Trial and Appellate Counsel Division, the parent organization for the STC and other Air Force trial counsel.

[17] The military judge found the email sparked a professional responsibility inquiry, but Chief Judge VS was unaware of the email until two or three years later when the JAJG deputy director was being considered for an assignment with the trial judiciary.

[18] The Chief Military Judge in Europe mentioned in this paragraph was Judge DE's predecessor in that position.

know that Judge CL had dismissed the charges and specifications with prejudice. During that conversation, Chief Judge VS was also made aware that the Chief Regional Military Judge in Europe had concerns about Judge CL's temperament on the record in his interactions with the STC. Chief Judge VS learned more about Judge CL's temperament when he read this court's decision in *Bowser* issued on 3 October 2014. Judge CL had expressed concern on the record that the STC in *Bowser* did not understand the Government's discovery responsibility. Judge CL then made this comment: "There is no question, no question I can't imagine in anyone's mind, but certainly not in this court's mind, that that is *Brady* material; that is classic first year prelaw *Brady* material." *Id.* at 893–94.

After this court's *Bowser* decision, on 6 October 2014 the SJA who advised the convening authority at Third Air Force forwarded an email to Chief Judge VS from the SJA at the base where that case was tried. The email related that the alleged victim in the *Bowser* case "believed from early on in the case that [Judge CL] had predetermined the outcome based on his on[-]the[-]record comments/actions." The Third Air Force SJA informed Chief Judge VS that he and the SJA for the USAFE, a senior colonel, "thought you might like to see this, in particular the section about the perceptions [by] the victim." On 7 October 2014, Chief Judge VS, in turn, forwarded the email to Judge DE, commenting,

> As you provide solid mentoring on civility and demeanor – I offer the following as well . . . I want you to understand (and I know you do), this is not a critique of the decision, but the importance of bearing, demeanor, and conduct always . . . because people are always watching.

> A fair reading of *Bowser* . . . made clear what I already knew – this was not a ringing endorsement of the behavior of our judge . . . .

Later that day, Chief Judge VS indicated in a second email to Judge DE, "My push remains as the judge you can always be civil and leave the condescending comments at the door."

### ii) United States v. Miller

Sometime after his ruling in *Bowser*, Judge CL was appointed as the Article 32, UCMJ, IO in the matter of *United States v. Miller* at Aviano Air Base, Italy. The same STC and special victims' counsel (the SVC) in *Bowser* made appearances on behalf of their respective clients in *Miller*. During the course of the SVC's representation of the alleged victim in *Miller*, the SVC believed that Judge CL had misapprehended the legal standard to compel a witness to testify. Notably, in an email Judge CL sent to the STC and SVC on 21 August 2014, Judge CL stated his belief that the government representative should

present two choices to the complaining witness: "[c]ooperate with the [G]overnment, and the [G]overnment will proceed with the investigation," on the one hand, or "[c]hoose not to cooperate with the [G]overnment, and the allegation will be dismissed," on the other. Judge CL "ask[ed] that the [G]overnment either acquire the witness's cooperation, or dismiss the charges."[19]

Because the SVC believed Judge CL had applied an incorrect legal standard to seek to compel her client to testify, she asked him to recuse himself from further participating as the IO. However, as found by the military judge, the Government did not join the request in order "to keep the proceedings on track and to avoid any UCI issues with removing or challenging the investigating officer."

After the *Bowser* ruling, and during the time of the *Miller* Article 32, UCMJ, hearing, the STC and SVC complained to each other about Judge CL over dinner. As found by the military judge, "They were still upset about his rulings in *U.S. v. Bowser* and his finding of not guilty in another case." The military judge further found that (1) they complained that Judge CL was defense-friendly and was biased in certain Article 120, UCMJ, cases; and (2) the STC "said that he was considering conducting voir dire of [Judge CL] regarding this issue and challenging him for bias in sexual assault cases. They also talked about filing some kind of complaint against [Judge CL]."

At the rehearing, the STC testified on the UCI motion under a grant of immunity. The STC acknowledged sharing his concerns about Judge CL's rulings with his JAJG chain of command. He also shared with other trial counsel the possibility of challenging Judge CL's impartiality in sexual assault cases in which the rumor he heard about Judge CL's past personal experience could be relevant. At the same time, the STC denied ever asking any SJA to take proactive steps to keep Judge CL from cases. However, he did acknowledge hearing a rumor from a peer who was assigned to Aviano Air Base, Italy, that the installation sought to use Judge CL as an IO on a regular basis to conflict Judge CL from presiding as a military judge over Article 120, UCMJ, cases.

As part of his testimony on the motion, the STC explained that after Judge CL served in the capacity as the IO in the *Miller* Article 32, UCMJ, hearing, the STC would candidly discuss his concerns about Judge CL with other judge advocates. Those discussions broached whether Judge CL was "fit as a military judge," and if Judge CL should be sitting on "these kinds of cases" in apparent reference to *Bowser* and *Miller*. The STC had these conversations with his

---

[19] Judge DE testified at the rehearing about these emails. He found these "sort of tacit threats with perhaps inaccurate or missing information from the [M]anual [for Courts-Martial]" were "very concerning to [him] as [Judge CL's] supervisor."

"chain of command," "co-counsel," and "anybody else [who] was expressing frustrations" with Judge CL.

### iii) United States v. Jay

On 31 October 2014, Judge CL announced the findings and sentence in the judge-alone court-martial of *United States v. Jay* at Ramstein Air Base, Germany. Judge CL found the accused not guilty of several specifications of sexual assault, and guilty of assault consummated by a battery. In sentencing, the prosecution recommended a sentence that included confinement for six months and a bad-conduct discharge (BCD). During the trial counsel's argument, Judge CL interrupted and asked how that case was different from the typical domestic assault case that results in disposition by nonjudicial punishment (NJP) under Article 15, UCMJ, 10 U.S.C. § 815 (2012 *MCM*). As later discussed in this opinion, Chief Judge VS was concerned about Judge CL's civility and objectivity as demonstrated by those comments and statements Judge CL included in his case report. Eventually, Chief Judge VS learned about this comment and other comments Judge CL made either during the *Jay* sentencing argument or when Judge CL made a clemency recommendation on the record.[20]

After the conclusion of the *Jay* court-martial, an Air Force captain who was also assigned as a special victims' counsel in Europe approached Judge CL outside the base legal office. As found by the military judge, the captain "deliberately sought [Judge CL] out for the particular reason of informing him there was a conspiracy between [the STC] and [SVC]." On 3 November 2014, the captain followed up that conversation with an email she sent to Judge CL stating her understanding that the STC and SVC were intent on seeing Judge CL removed from the bench. In that email she explained that the STC and SVC believed that Judge CL had a bias against certain sexual assault victims based on a rumor about Judge CL's personal experience that was accepted as truth. The captain related that the STC and SVC said they were going to voir dire Judge CL "in the near future" about that experience. She concluded, "I think it is unfair how [the STC and SVC] are both intent on trying to get [Judge CL] conflicted off of sexual assault cases and get [Judge CL] off the bench as they are upset about the *Bowser* case."

As found by the military judge, Judge CL "was not concerned about this information. He simply 'blew it off,' taking it to be two attorneys who recently had a couple of bad cases in front of him and 'were upset and were just kind of blowing off steam . . . .'" In early November 2014, Judge CL informed Judge DE of the conversation with the captain and her follow-up email. Judge DE, in

---

[20] Judge CL recommended the convening authority substitute NJP for the conviction.

turn, informed Chief Judge VS; however, Judge DE did not relay the rumor about Judge CL's personal experience.

### b. Decision to Remove Judge CL from Presiding at Appellant's Court-Martial

On 25 November 2015, Chief Judge VS removed Judge CL from presiding at Appellant's court-martial. He made that decision after he received information about Judge CL in October and November of that year. Some of that information was in the form of emails Judge DE sent to Chief Judge VS, which largely centered on the *Bowser*, *Miller*, and *Jay* cases. At the same time, emails that Chief Judge VS sent to Judge DE illuminate Chief Judge VS's intent in removing Judge CL from cases as that decision bears on Appellant's claim of unlawful influence that is before the court. The following findings of fact touch on these points in some detail.

After reading this court's *Bowser* decision in early October 2014, Chief Judge VS was aware of Judge CL's "first year prelaw *Brady* material" statement on the record that admonished the STC for his discovery violation. On the same day as this court's decision, Chief Judge VS communicated in an email to Judge DE that "some mentoring might be appropriate" because he found that particular comment of Judge CL was "uncivil." Chief Judge VS concluded, "[T]here are some lessons learned for the trial judge," referring to Judge CL.

As found by the military judge, Chief Judge VS "was concerned about some of the comments in the [*Bowser*] case. He thought that the 'first year prelaw' comment [was] insulting and the comment was unnecessary 'in a public forum, where we're trying to show that we, as an Air Force [Trial] Judiciary, conduct ourselves as professionals.'" The military judge further found Chief Judge VS had

> communicated his concerns to [Judge DE], assuming that [Judge DE] would provide mentorship about being courteous. He wanted [Judge DE] to impress on [Judge CL] that their concerns had nothing to do with [Judge CL's *Bowser*] decision, but lack of civility.
>
> . . . [Chief] Judge [VS] forwarded the email he received from [the SJA at Third Air Force] so [Judge DE] could have situational awareness and possibly use the information as a teaching point. He did not forward it for any reason having to do with [Judge CL]'s rulings in *U.S. v Bowser*. The email did not influence [Chief] Judge [VS]'s decision to remove [Judge CL].

After Chief Judge VS read the *Bowser* decision, early the following week on 7 October 2014 he relayed to Judge DE his impressions about the emails Judge CL had written in his capacity as the Article 32, UCMJ, IO in the *Miller* case. The emails, exchanged in the August 2014 timeframe, had been forwarded to Chief Judge VS by the Government. The emails revealed Judge CL was annoyed by the Government's decision not to insist that the alleged victim in that case testify at the hearing as a condition of the charges going forward. Judge CL stated it was "obvious that the failure of the complaining witness to testify makes a mockery of the stated intent for an Article 32[, UCMJ, investigation]." He stated his belief that the Government "likely could successfully encourage the witness to testify" at the same time recognizing that "the [G]overnment has no authority to compel the production of the witness." Chief Judge VS was dismayed by Judge CL's "word choice" as it demonstrated "some disdain that appeared visible in [his] written missives" to counsel.

On Saturday, 1 November 2014, Judge DE emailed Chief Judge VS and shared what Judge CL had told him about the conversation Judge CL had with the captain after the *Jay* court-martial. In that email, Judge DE relayed the "rumor" Judge CL heard in the "SVC community that there's a discussion (petition?) about [Judge CL] being too 'defense friendly.'" Judge DE further relayed "there was some sort of meeting between the SVCs and people w/in 3 AF/JA which led to some sort of conversation about 'loss of confidence' which could lead to some sort of ethics(?) complaint" against Judge CL.

Meanwhile, on 6 November 2014, Chief Judge VS reviewed the case report Judge CL submitted after the *Jay* court-martial. That review spurred an exchange of emails between Chief Judge VS and Judge DE. As noted earlier in this opinion, in that report Judge CL remarked that he had interrupted the trial counsel's argument and asked how the domestic assault consummated by a battery case in *Jay* was different from cases routinely disposed of by NJP under Article 15, UCMJ. Judge CL remarked in his report that the trial counsel "apparently later expressed that I was critical during my question," and "[t]his is the fourth time I have seen findings result in an NJP-type offense, and the [G]overnment argue[s] for several months and/or a BCD."

Chief Judge VS evinced concern about these comments in an email he sent to Judge DE on 6 November 2014. In reference to the *Jay* sentencing, Chief Judge VS related a specific concern he had about Judge CL's objectivity:

> I am trying to figure out how a factfinder would decide to interrupt, chastise, and has an opinion that this is responded to typically with NJP—as he is required by law to consider the full range of punishment in order to remain on a case. This causes me real concern about objectivity.

Owing to that concern, in the same email Chief Judge VS likewise remarked, "What [Judge CL] can't do is demonstrate potential bias." He told Judge DE this was an opportunity for "[a]nother mentoring moment" for Judge DE to have with Judge CL. At the same time, Chief Judge VS suggested Judge DE listen to the audio recording of the sentencing hearing.

On 12 November 2014, Chief Judge VS reiterated that Judge DE listen to audio recordings of the *Jay* proceeding because, as described by Judge CL in his own case report, Chief Judge VS thought Judge CL's "commentary was pretty out of the bell curve." Chief Judge VS related to Judge DE that Air Force professional responsibility "standards have a pretty good description of civility, objectivity, appearance . . . etc., and this is causing [him] a good deal of concern." (Omission in original). Chief Judge VS further related he was "[t]rying to figure out a correct road ahead."

On 14 November 2014, Judge DE reported back to Chief Judge VS that during the colloquy between Judge CL and trial counsel in the *Jay* case, Judge CL used words such as "flabbergasted," "inconceivable," and "wildly disparate" to convey the impression left on him by the prosecution's sentence recommendation. On the same day, Chief Judge VS emailed Judge DE relating that they "need to talk at some point" to discuss some unspecified "serious concerns" Chief Judge VS had.

As found by the military judge, on 25 November 2014 Chief Judge VS removed Judge CL from Appellant's case and three other general courts-martial. Each case involved charges under Article 120, UCMJ. Judge DE then detailed himself as the military judge, vice Judge CL, to preside at Appellant's court-martial. The same day, Chief Judge VS related in an email to his deputy that he had a "good talk" with Judge CL. Chief Judge VS explained to his deputy that he was directing some "judicious redetailing to give counsel and [Judge CL] a bit of breathing room, and to give [Judge CL] some time to think through appearance and such." Chief Judge VS considered such redetailing to be "well within [their] discretion" at the trial judiciary.

Judge DE spoke to Judge CL after the redetailing and relayed back to Chief Judge VS that Judge CL "seemed to have some difficulty separating temperament issues from rulings." Chief Judge VS explained to Judge DE in an email, "[W]e can start docketing forward on [Article] 120[, UCMJ,] cases that are appropriate." Chief Judge VS elaborated, "It is not simply a[n Article] 120[, UCMJ,] bar . . . but detailing appropriately."

After Judge DE asked for clarification of that guidance, Chief Judge VS explained, "maybe not near the STC that is problematic." Chief Judge VS elaborated that general court-martial "cases that involve multiple serious victims" or "force" were "probably okay," but "rape - not so much," and "domestic abuse

- not for a[ ]while." As general guidance, Chief Judge VS offered, "I think with the dash of cold water over him, the talk we had, and what appear to be real understanding, we can move forward and use [Judge CL] appropriately."

### c. Judge CL's Response to the Removal

When he learned that shortcomings in civility and temperament were the grounds for his removal from presiding over Appellant's case and others, Judge CL sent an email to Chief Judge VS.[21] Judge CL "genuinely believe[d] JAT[22] [wa]s not acting in response to the merit of any of [his] rulings." As Judge CL saw it, his removal "had nothing to do with sexual assault cases." At the same time, he believed "[t]he nexus to sexual assault [cases wa]s . . . more than just coincidental." He identified the *Bowser*, *Miller*, and *Jay* cases to make his point. In his words,

> [A]ll three cases involve[d] the same [STC], a counsel I have re-peatedly found to be in error on the law, always to the detriment of the accused. . . . I have tried many other cases, some with other [trial] counsel, and to my knowledge I have earned no JAT-censure for those. These were not the first cases I have had with this counsel.

In the same email, Judge CL relayed in general terms his concerns about the conduct of the STC in those cases and others:

> This common [senior] trial counsel has made numerous mind-numbing legal miscues, costing the [G]overnment a sex assault case, and several months of delays and tens of thousands of dol-lars wasted in 2 other sex assault cases. I won't get into them now, but some were far worse than failing to recognize *Brady*[23] material. But rather than fire him, he continues to try their cases. They support him despite some major acknowledged mis-takes. I am a judge who has not made any errors of that magni-tude, in whom there must be a belief in his independence, and

---

[21] Judge DE was included on the email.

[22] "JAT" (AF/JAT) refers to the Air Force Trial Judiciary that was led by Chief Judge VS when he was the Chief Trial Judge.

[23] *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("suppression by the prosecution of evi-dence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"); *see also* Article 46, UCMJ, 10 U.S.C. § 846 (2012 *MCM*).

instead I am removed from these cases. At least for the time being, when I look at trial counsel, [and] when I look at a[ special victims' counsel], I have to acknowledge they have won.

Judge CL understood Chief Judge VS removed him from cases at the same time as Judge DE had previously counseled him for his "word choice," "civility," and "what might be termed [']judicial temperament,[']" in *Bowser*, *Miller*, and *Jay*. Judge CL explained that he became more direct in the language he used to confront the STC—in Judge CL's words, "some well-earned criticism"—only after he had tried other approaches:

> I had tried other avenues to address these concerns for about a year before *Bowser*, such as feedback to counsel, feedback to the SJA, etc. (I actually like the [STC].) But at some point, a judge should make his displeasure of continued violations known. And right or wrong, I did.

Judge CL defended his actions in the *Jay* case, explaining

> I challenged an attorney to justify a rather ridiculous sentence recommendation, violated no law or R.C.M. [(Rule for Courts-Martial)], and for this indiscretion I have quickly been busted down a rank. At least that is how I understand it. I do not understand how what I did there was so egregious to merit such a public demotion.

In that same email Judge CL addressed his "restriction" against presiding over sexual assault cases and began with how it would appear to an outside observer:

> My fault or otherwise, I personally feel humiliated by this. It's not that I am being told I have made mistakes (I struggle with that every day), it's that this is a serious public censure by JAT. It is obvious I am being replaced on all [Article] 120[, UCMJ,] cases. This impeaches in many ways all of my past judicial actions, and my future ones. Those unhappy with my past decisions can now point, not to the state of the evidence or the law, but that the cause of the unfortunate result was ["Judge CL"]. Same in the future. ["]And JAT concurred so greatly that it publicly removed [Judge CL] from the [Article] 120 arena.["] Even if not the intent, in their eyes, JAT has endorsed all of their concerns.

Judge CL also expressed, "I do not know how much of this was designed to be a reprimand for me, but if so, I am saddened it came with no warning, no

counseling, and little opportunity to respond." He explained, "I welcome feedback, [and] I can handle criticism, but I never thought I would be publicly censured for judicial acts."

In the weeks that followed the redetailing, Judge CL struggled over whether he had a duty to disclose his temporary removal to counsel in the one Article 120, UCMJ, case to which he remained detailed. He sent an email to Judge DE stating, "After reflection, I genuinely regret some of my statements (*Bowser* slam of [trial counsel], and inartful wording in *Jay* clemency recommendation)." Judge CL noted that both Chief Judge VS and Judge DE "mentioned complaints from the SVC when speaking to me." Judge DE replied:

> I guess I'd just throw in for your consideration and pondering over the evening that the keys to Art[icle] 120[, UCMJ,] cases haven't been completely removed . . . Further, the decision was to help build some space between you and the SVC community. After your chat with [Chief Judge VS], the direction was to ease you back in the water with some separation between you and the particular STC and SVC to the extent possible.

Judge CL testified at the rehearing. His testimony lends support to the military judge's finding that Judge CL's rulings and decisions in *Bowser*, *Miller*, and *Jay* did not influence his removal from cases. Trial counsel asked Judge CL about conversations he had with Chief Judge VS and Judge DE when he was removed from cases:

> Q [Trial Counsel]. During these conversations, did your competence in your prior rulings ever come up?
>
> A [Judge CL]. No. Not in the rulings, not at all. In fact, I - if I may? [Chief Judge VS] loved the *Bowser* ruling - you know - I remember him distinctly saying that. Obviously it had something to do with judicial authority as well, but I remember him specifically saying he liked it. But other than that, it was not discussed.
>
> Q. So as a matter of competence of [sic] your ruling was never a focus?
>
> A. No.
>
> Q. And in fact, moving forward, it's true that what had happened, this decision, and the cases that you didn't sit on for that period of time, you would say that it also didn't impact the way you ruled moving forward?
>
> A. No.

Q. It didn't impact your willingness to make decisions based on how you saw the issues?

A. No.

**2. Law**

The prohibition against unlawful influence arises from Article 37(a), UCMJ, which provides in relevant part that:

> [n]o person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts.

10 U.S.C. § 837(a) (2012 *MCM*); *see also* R.C.M. 104(a)(2) (substituting "code" for "chapter," and "such authority's judicial acts" for "his judicial acts").

The United States Court of Appeals for the Armed Forces (CAAF) "has long recognized that Article 37(a)[, UCMJ,] prohibits unlawful influence by all persons subject to the UCMJ." *United States v. Barry*, 78 M.J. 70, 76 (C.A.A.F. 2018) (citing *United States v. Gore*, 60 M.J. 178, 178 (C.A.A.F. 2004)). A claim of unlawful influence from a non-command source is evaluated by application of the same test that is used to evaluate "abuses perpetrated by those in command or those acting with the mantle of command authority." *Id.* at 76–77.

"[T]he plain language of Article 37(a), UMCJ, does not require intentional action." *Id.* at 78 (finding actual command influence). In this regard, the CAAF has stated that "an 'improper manipulation of the criminal justice process,' even if effectuated unintentionally, will not be countenanced by this [c]ourt." *Id.* (quoting *United States v. Boyce*, 76 M.J. 242, 247 (C.A.A.F. 2017) (finding appearance of UCI)); *see also United States v. Rosser*, 6 M.J. 267, 273 n.19 (C.M.A. 1979) (quoting H. Moyer, *Justice and the Military*, § 3-400 (1972)) ("[T]he fact that the system appears vulnerable to command pressures may be as damaging as the occasional exercise of such pressures. Individuals react to phenomena, after all, on the basis of their perceptions of those phenomena.")

An appellate court "reviews allegations of unlawful command influence, including allegations of the appearance of unlawful command influence, de novo." *United States v. Proctor*, 81 M.J. 250, 255 (C.A.A.F. 2021) (citing *United States v. Bergdahl*, 80 M.J. 230, 234 (C.A.A.F. 2020)); *Barry*, 78 M.J. at 77; *United States v. Salyer*, 72 M.J. 415, 423–24 (C.A.A.F. 2013) (reviewing "lower court's analysis, reasoning, and conclusion regarding the appearance of unlawful command influence" de novo).

When an allegation of UCI is litigated at trial, the military judge's findings of fact are reviewed for clear error. *United States v. Johnson*, 54 M.J. 32, 34 (C.A.A.F. 2000). As a result, an appellate court is bound by the military judge's factfinding absent such showing. *Barry*, 78 M.J. at 78 (citing *United States v. Villareal*, 52 M.J. 27, 30 (C.A.A.F. 1999)). This means an appellate court must "accept as true the military judge's findings of fact on a motion to dismiss for unlawful command influence unless those findings are clearly erroneous." *Proctor*, 81 M.J. at 255 (citing *United States v. Stirewalt*, 60 M.J. 297, 300 (C.A.A.F. 2004)). The demeanor of a witness "is critical to evaluate whether there is an objective appearance of unfairness" in resolving claims of UCI. *United States v. Stoneman*, 57 M.J. 35, 42 (C.A.A.F. 2002). Nonetheless, "[m]ilitary law has traditionally viewed such perfunctory statements from subordinates on the effects of command influence as inherently suspect, not because of the credibility of the witness but because of the difficulty of the subordinates in ascertaining for himself [sic] the effect of any attempted command influence." *Rosser*, 6 M.J. at 272; *see also United States v. Rodriguez*, 16 M.J. 740, 742–43 (A.F.C.M.R. 1983).

"Two types of unlawful command influence can arise in the military justice system: *actual* unlawful command influence and *the appearance of* unlawful command influence." *Boyce*, 76 M.J. at 247. Actual UCI "is an improper manipulation of the criminal justice process which negatively affects the fair handling and/or disposition of a case." *Id.* (citations omitted). In order to demonstrate actual UCI, the appellant "must show: (1) facts, which if true, constitute unlawful command influence; (2) that the proceedings were unfair; and (3) that the unlawful command influence was the cause of the unfairness." *Salyer*, 72 M.J. at 423 (citing *United States v. Richter*, 51 M.J. 213, 224 (C.A.A.F. 1999)). "[T]he initial burden of showing potential unlawful command influence is low, but is more than mere allegation or speculation." *Id.* (citing *Stoneman*, 57 M.J. at 41).

> Once an issue of unlawful command influence is raised by some evidence, the burden shifts to the [G]overnment to rebut an allegation of unlawful command influence by persuading the Court beyond a reasonable doubt that (1) the predicate facts do not exist; (2) the facts do not constitute unlawful command influence; or (3) the unlawful command influence did not affect the findings or sentence.

*Id.* (citing *United States v. Biagase*, 50 M.J. 143, 151 (C.A.A.F. 1999)).

Unlike actual UCI, a meritorious claim of an appearance of UCI does not require prejudice to an accused. *Boyce*, 76 M.J. at 248. Rather, the prejudice is the adverse impact to the "public's perception of the fairness of the military justice system as a whole." *Id.* As with actual UCI, "when an appellant asserts

there was an appearance of unlawful command influence[,] [t]he appellant initially must show 'some evidence' that unlawful command influence occurred." *Id.* at 249 (footnote omitted) (quoting *Stoneman*, 57 M.J. at 41) (additional citation omitted). "[S]ome evidence of an appearance of unlawful command influence" exists when "it ha[s] the potential to appear to coerce or . . . influence the outcome" of a court-martial. *Bergdahl*, 80 M.J. at 236 (internal quotations marks omitted) (omission in original) (citing *Boyce*, 76 M.J. at 249, 253).

If the Government fails to rebut an appellant's factual showing, it may still prevail against a claim of apparent UCI if it proves "beyond a reasonable doubt that the unlawful command influence did not place 'an intolerable strain' upon the public's perception of the military justice system and that 'an objective, disinterested observer, fully informed of all the facts and circumstances, would [not] harbor a significant doubt about the fairness of the proceeding.'" *Id.* at 249–50 (alteration in original) (quoting *Salyer*, 72 M.J. at 423). "Deciding whether some evidence of unlawful command influence created an intolerable strain on the public's perception of the military justice system is a fact-intensive inquiry." *Proctor*, 81 M.J. at 258.

Should the Government fail to meet its burden to rebut an appellant's threshold showing of UCI, then, as a matter of law, an appellant has established UCI affecting the findings or sentence. *United States v. Riesbeck*, 77 M.J. 154, 166 (C.A.A.F. 2018) (citations omitted).

**3. Analysis**

***a. Appellant's Threshold Showing of Some Evidence of Unlawful Influence***

The military judge found the Defense met its initial burden of presenting some evidence of unlawful influence at Appellant's original court-martial. He determined "that the proximity of events is circumstantial evidence of a connection between the alleged UCI and [Chief Judge VS]'s decision to remove [Judge CL] from general courts-martial." He explained,

> The closeness in time itself is sufficient to show that [Chief Judge VS]'s decision may have been improperly influenced by the alleged UCI. Although the prejudice to the military justice system (apparent UCI) is obvious, the prejudice to the accused (actual UCI) is minimal. Nevertheless, the Court concludes that the Defense has met the low burden of showing that if the Government improperly removes a "defense friendly" military judge, it is to the benefit of the Government and the detriment of the accused.

We agree with the military judge that Appellant has met his threshold showing of some evidence of unlawful influence in Chief Judge VS's decision to remove Judge CL from presiding at Appellant's court-martial.

### b. Government's Burden of Persuasion

Because Appellant has shown some evidence of unlawful influence, the Government assumes a high burden to show that the judicial proceedings below were both fair and will be perceived as fair. Its burden must be no less than when there is some evidence of an inappropriate attempt by the Government to unseat a properly qualified and detailed military judge. *See Salyer*, 72 M.J. at 424–25; *see also United States v. Lewis*, 63 M.J. 405, 414 (C.A.A.F. 2006).

The military judge determined that actual and apparent unlawful influence in this case "does not exist." In this regard, he was convinced beyond a reasonable doubt that Chief Judge VS "was not influenced or manipulated in any way by [g]overnment actors."[24] In line with the military judge's findings, the record demonstrates beyond a reasonable doubt that Chief Judge VS's decision to remove Judge CL from Appellant's case was made without influence from government actors who regarded Judge CL as "defense friendly," and not because of it. We find the military judge's findings of fact are not clearly erroneous, and in our de novo review we agree with the legal analysis of the military judge. We reach these conclusions for the following reasons:

### i) Litigation of Appellant's Claims at the Rehearing

The court is satisfied the hearing that the military judge presided over to decide the matter "fully dispersed" the appearance of UCI in Appellant's case. *United States v. Campos*, 42 M.J. 253, 261 (C.A.A.F. 1995) ("[A]ny question about the fact of unlawful command influence or any role that its appearance might have played in appellant's trial was openly addressed and resolved."). Six witnesses testified including Chief Judge VS, Judge DE, Judge CL,[25] and the key government actors whose conduct invited scrutiny of decisions Judge CL made that they disliked. As found by the military judge, Judge CL "never thought [Chief Judge VS and Judge DE] were critiquing him for his rulings."

---

[24] The military judge concluded that apparent unlawful influence from a plan to use Judge CL as an Article 32, UCMJ, IO was disproven beyond a reasonable doubt. He found it "had no impact whatsoever on the accused's proceedings" and that "procedures are now in place that prevent the possible misuse of judges as IOs." Therefore, "a disinterested observer would not harbor any significant doubt about the fairness of the proceeding or the fairness of the military justice system." For reasons discussed later in the opinion, *see* n.28 *infra*, we agree.

[25] Chief Judge VS and Judge CL had retired from active duty and testified in a civilian capacity at the hearing. Judge DE was on terminal leave awaiting retirement.

He also "never thought that he was being removed from [general courts-martial] for inappropriate reasons. However, [Judge CL] was extremely concerned about appearance issues."

The hearing addressed apparent unlawful influence by illuminating the reason why Judge CL was removed from cases. As in *Campos*, "the full and open litigation" of Appellant's allegations of unlawful influence would leave "no reasonable person who knew all of the facts" to "harbor any misgivings regarding either the fact of unlawful command influence or the role that an appearance of it might have played" in the findings and sentence reached at the rehearing. *Id.*

### ii) Chief Judge VS's Reason for Removing Judge CL

The military judge found "the sole reason" why Chief Judge VS removed Judge CL from general courts-martial was to send Judge CL a message about civility. The military judge similarly found Judge VS's "concern was solely courteousness and civility" and that "[t]he timing of [Chief Judge VS]'s decision was based solely on [his] concerns about [Judge CL]'s judicial temperament during *U.S. v. Jay*." These findings are supported by evidence and are not clearly erroneous.

The record is clear that Chief Judge VS's purpose in removing Judge CL from Article 120, UCMJ, cases was to separate him from the STC who was apt to provoke rebukes from Judge CL. The evidence shows Chief Judge VS's intent was to remove Judge CL from situations where Chief Judge VS found Judge CL's civility and objectivity to be lacking after mentoring by Judge DE. Consistent with the military judge's findings of fact, a fully informed observer would conclude that Chief Judge VS's purpose was to uphold professionalism within the trial judiciary, and not undermine it.

### iii) Absence of a Pretext Reason to Remove Judge CL

The evidence in the record supports the military judge's findings of fact that "[t]here were no 'pretext reasons' for removing [Judge CL] from cases" and that his removal was not "because of his rulings, decisions, or findings." In contrast to the "orchestrated effort" by a trial counsel and a staff judge advocate to unseat the military judge in *Lewis*, 63 M.J. at 414, the military judge rejected the notion of a concerted effort to remove Judge CL from the bench that swayed Chief Judge VS's detailing decisions. He found "no connection whatsoever between the alleged conduct of [g]overnment actors and [Chief Judge VS]'s decision" to remove Judge CL from cases. Importantly, he concluded Chief Judge VS "was not influenced or manipulated in any way by [g]overnment actors."

In line with the military judge's ruling, we too are convinced beyond a reasonable doubt Chief Judge VS did not remove Judge CL from cases because of his rulings, findings, or a decision he made in Appellant's case or class of cases.

In this regard, Chief Judge VS's decision was not unlawfully influenced by any "complaint, email, or observation from anyone outside the judiciary" as also found by the military judge. The record shows beyond a reasonable doubt that Chief Judge VS made the decision to remove Judge CL from Appellant's case independent of government actors who disagreed with Judge CL's decisions. *See Stirewalt*, 60 M.J. at 300 ("The question of command influence flowing from [a military judge's findings of fact] is a question of law that we review de novo." (footnote omitted)); *Johnson*, 54 M.J. at 34; *see also United States v. Wallace*, 39 M.J. 284, 286 (C.M.A. 1994).

### iv) Later Ameliorative Actions

The court has recognized that "[t]he exercise of unlawful command influence may be cured by a rehearing and does not require dismissal of the charges." *Rodriguez*, 16 M.J. at 743. In this regard, we find any appearance of unlawful influence in the removal of Judge CL was "ameliorated by later actions and remedial steps" taken by military officials. *Lewis*, 63 M.J. at 414.

After the court set aside Appellant's convictions and a sentence that included nearly three decades of confinement, Chief Judge VS was recused from judicial detailing in Appellant's case. In his place, the Chief Trial Judge of the Army identified a qualified military judge who was detailed to preside at Appellant's rehearing. *See United States v. Simpson*, 58 M.J. 368, 373 (C.A.A.F. 2003) (stating a "transfer of responsibility" is among the actions that might show UCI "will not affect the proceedings in a particular case"). Once detailed, the military judge afforded counsel for both parties three opportunities to challenge him in Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2012 *MCM*), sessions, which spanned arraignment on 20 August 2018 and Chief Judge VS's testimony on 12 December 2018. Appellant did not explore any grounds for challenge against the military judge. *See Vargas*, unpub. op. at *23 (concluding "[t]he UCI issue should have been litigated at the trial level and decided by a neutral and detached military judge prior to any appellate review of that issue by this court").

The record does not yield reasons for a member of the public to question the military judge's independence and impartiality unlike it did when Judge DE presided over the case. Appellant makes no claim against, and we find no reason to question, the actual or apparent independence of the military judge who presided at the rehearing. *See United States v. Mitchell*, 39 M.J. 131, 137 (C.A.A.F. 1994) (observing that "a servicemember has a Constitutional right to a judicial tribunal which appears independent"). On these facts, a "disinterested public would now believe [Appellant] received a trial free from the effects of unlawful command influence." *Lewis*, 63 M.J. at 415; *see also Boyce*, 76 M.J. at 248.

### v) Absence of Prejudice

None of the government actors who openly criticized Judge CL and then communicated discontent with his rulings and other decisions either participated in Appellant's original trial or served in a representative capacity at the rehearing. *Cf. Lewis*, 63 M.J. at 414 ("[Trial counsel] remained an active member of the prosecution despite participating fully in the unlawful command influence."). In this regard, "[a] significant factor in determining whether the unlawful command influence created an intolerable strain on the public's perception of the military justice system is whether the 'appellant was not personally prejudiced by the unlawful command influence, or that the prejudice caused by the unlawful command influence was later cured.'" *Proctor*, 81 M.J. at 255 (quoting *Boyce*, 76 M.J. at 248 n.5).

The Government did not derive an improper advantage at the rehearing, as the military judge was detailed from outside the Air Force Trial Judiciary.[26] Importantly, Chief Judge VS removed Judge CL before he made any substantive rulings in Appellant's case.[27]

### vi) Conclusion

The court is convinced beyond a reasonable doubt that the results of Appellant's rehearing were not the product of unlawful influence. We are likewise convinced beyond a reasonable doubt that the conduct of government actors and Chief Judge VS's decision to remove Judge CL from presiding over Appellant's case "did not place an intolerable strain upon the public's perception of the military justice system and that an objective, disinterested observer, fully informed of all the facts and circumstances, would not harbor a significant doubt about the fairness of the proceeding."[28] *Proctor*, 81 M.J. at 257 (citing *Bergdahl*, 80 M.J. at 234).

---

[26] Appellant was "entitled to a fair and impartial judge," *United States v. Cooper*, 51 M.J. 247, 250 (C.A.A.F. 1999), who was judicially independent. *United States v. Graf*, 35 M.J. 450 (C.A.A.F. 1992). He was not entitled to a have a particular military judge detailed to his case. *See United States v. Lewis*, 63 M.J. 405, 414 (C.A.A.F. 2006) ("Neither the [G]overnment nor the [D]efense at a court-martial is vested with the power to designate, detail, or select the military judge.").

[27] As noted above, Judge CL issued a scheduling order on 20 October 2014.

[28] The military judge reached this same conclusion as regards "the plan to use [Judge CL] as an Article 32[, UCMJ,] IO." The military judge explained the plan "had no impact whatsoever on the accused's proceedings and procedures are now in place that prevent the possible misuse of judges as IOs." We are convinced beyond a reasonable doubt that this conclusion is correct. In this regard, a "nexus" between Appellant's

We are confident that the findings and sentence adjudged at the rehearing were the result of judicial rulings and evidence untainted by impropriety or its appearance. On this record, we are convinced a member of the public would conclude that Appellant's rehearing was presided over by a fair and impartial military judge and would not question "the outcome of Appellant's court-martial." *Bergdahl*, 80 M.J. at 236.

## B. Evidentiary Sufficiency of Conviction for Sexual Assault of WN

### 1. Additional Background

Appellant was convicted of the sexual assault of WN when she was incapable of consenting to the sexual act because of impairment by alcohol as alleged in Specification 3 of Charge II. The finding of guilty is founded on an incident in a parking garage in October 2013 after Appellant, WN, and three other Airmen from their circle of friends went to a club in Koblenz, Germany.

#### a. The Prosecution's Case

The evening began in a hookah bar where the Airmen drank alcohol before the 45-minute drive to Koblenz. When they arrived in Koblenz in a Jeep driven by one of the Airmen, they parked in a two-story garage that was monitored by security cameras. A stairwell led to the club's entrance above the garage.

At the club, the five Airmen consumed drinks they poured themselves from bottles of vodka they ordered for their table. At trial, the Prosecution presented the testimony of the three Airmen who accompanied Appellant and WN. The Airman who was the designated driver described WN as coherent and her speech was not slurred. Later in the evening, the driver and another Airman decided to cut off WN from drinking after she punched a German patron in the chest for reasons that were unknown to witnesses who testified about the incident. WN had also fallen down after she stumbled on stairs that led from their table to the dance floor. One Airman recalled that WN had consumed three or four vodka drinks at the club. This was in addition to two or three drinks containing rum that another Airman saw WN consume earlier at the hookah bar.

WN was called as a witness by the Prosecution. She had three rum drinks at the bar before they drove to Koblenz. The only drink she remembered having at the club is the first, which she poured herself. She acknowledged having difficulty remembering events at the club, and had no memory of later being

---

claim of unlawful influence and the outcome of his court-martial is lacking because Judge CL was not the Article 32, UCMJ, IO in Appellant's case. *See Campos*, 42 M.J. at 261; *see also United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999) (finding accused must show "the alleged unlawful command influence has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings." (citing *United States v. Allen*, 33 M.J. 209, 212 (C.M.A. 1991))).

assaulted in the parking garage. WN testified that on other occasions when she drank alcohol, she might not remember later what happened. Her last memory in the club was going to the restroom with one of the Airmen, and then the two danced together.

At the end of the night, the five Airmen left the club for the drive home. Three Airmen found their way back to the Jeep. At the same time, Appellant and WN were recorded by security cameras in the lowest level of the garage. Unlike WN who recalled little by way of what happened, a group of four German nationals saw Appellant and WN when both groups left the club. The Germans also witnessed aspects of the incident in question as they drove their sedan in the direction of the exit.

At trial, the Prosecution presented testimony from the four Germans. One had seen a man and woman kissing as they left the club and another described them as a "couple" by the way they had been dancing. As the Germans walked behind the man and woman down the stairwell to the garage, it appeared the woman was drunk and the man was helping her walk to keep her from falling.[29] Later when the Germans were driving through the garage, they saw the same man standing in front of the woman as she lay on the hood of a parked car. The most detailed account of the charged conduct was given by a passenger who sat in the back seat of the sedan. She explained that the driver came to a stop when they saw the same couple from the stairwell "having sex" on the hood of a parked car. The man was "standing in front of" the woman, "face to face," and "he was moving back and forth." The same witness saw the woman lying motionless on her back, her hands were "hanging down," and "she was not touching him at all." The witness explained how the driver honked the horn, which stirred no reaction from the woman. The man, however, "turned his head for some seconds," looked at the sedan, "[a]nd then he turned back and continued" what he was doing.

One of the three Airmen who returned to the Jeep for the ride home testified he went looking for Appellant and WN when they failed to join the others at their vehicle. He went back to the club and then searched for them in the garage as he yelled Appellant's name. In time, the Airman heard Appellant reply, "Yo," and turned to look in the direction of the voice. Instead of Appellant, the Airman saw WN on the hood of a parked car with her pants and underwear at her ankles. He testified she started crying when they made eye contact. The Airman did not see Appellant even as WN, with the Airman's help, got off the hood and put on her clothes. The Airman explained how he "just

---

[29] One witness described WN as "drunken" and "swaying left and right." Another saw Appellant and WN "swerving" walking down the stairs. A third described WN as "drunken" and "swerving" as she walked down the stairs.

pulled her pants and underwear back up and then she buttoned them." After she was dressed, Appellant appeared from behind the trunk of the car and walked around to the front. Shortly after, the three left to join the others for the ride home. Appellant left first and by himself, walking 15 to 20 meters ahead of the Airman and WN who walked together. WN testified having "just a very short glimpse of memory" of crying in the back seat of the Jeep after she rejoined her friends.

The Prosecution presented video recordings from four security cameras in the garage; however, no camera captured the charged conduct. As Appellant and WN are recorded leaving the stairwell, Appellant guides WN to a corner of the garage that is off camera and opposite the direction from where she initially appears to be looking or heading. About three minutes after they disappear from view, a sedan passes by and slows down as it turns a corner and then comes to a brief stop. In two of the videos that record this scene, passengers in the sedan who are closest to the camera appear to react to something that catches their attention off camera. After the sedan drives away, a video shows the Airman who went looking for his friends staring off camera into the corner of the garage for half a minute with his hands in his pockets. Two videos show that as the Airman walks toward the front of the car where he had been staring, Appellant appears to crouch behind the trunk, lending a reason why the Airman may not have seen Appellant initially. At one point, Appellant appears to be observing WN and the other Airman by peering through the rear window. Appellant then squats down before standing up and walking around the side of the car to the front where he is off camera. In time, Appellant is recorded walking away by himself. A short time later, the same video shows WN, fully clothed, trying to open a rear passenger door of the parked car by pulling on the door handle before the Airman leads her away to meet up with the others at the Jeep. Several minutes go by when a camera on a different level of the parking garage shows the Airmen getting in the Jeep and preparing to drive home.

At some point the next morning, WN realized she had worn her underwear inside out the night before. The cotton crotch was on the outside, and the sheer mesh-like synthetic lace was on the inside. Although she did not feel like she had sexual intercourse, on past occasions when she had sexual intercourse at night, when she woke in the morning she did not feel like she had had sex.

The Prosecution presented testimony from three special agents of the Air Force Office of Special Investigations (AFOSI) who investigated the charged offense. The agents collected evidence in the case, including recordings from security cameras in the parking garage. The agents did not similarly inquire whether any security cameras in the club could have provided relevant footage. The AFOSI agents also collected DNA from Appellant and WN, but did not

analyze stains on WN's pants. The evidence they did collect—her underwear and the DNA samples—were sent for forensic testing.

The Prosecution introduced the expert testimony of a forensic biologist who explained that the cotton crotch of the underwear revealed the presence of Appellant's semen. The expert did not test the outer layer of the underwear, but testified that semen can seep through cotton.

### b. The Defense Case

Appellant testified in his own defense. He remembered making out with WN as they left the club, but he did not remember walking down the stairwell to the parking garage. He recalled they kissed in the parking garage as she leaned against the hood of a parked car. He did not remember having sexual intercourse with WN, explaining she gave him "a handjob" by rubbing his penis underneath his clothes as he stood in front of her. He had no memory of how her pants and underwear came to be around her ankles. After hearing his name called by the Airman who went looking for them, he recalled answering, "Yo." After that, he went around the parked car to dress so he would not be seen by the Airman with his pants down.

On cross-examination, Appellant testified he did not know if WN was drunk, and did not know if her breath smelled of alcohol when they were kissing. He did not remember the Germans in the stairwell and he had no memory of WN "swerving" or "swaying back and forth," much less holding on to her to keep her from falling when they walked together down the stairs to the garage. Appellant did not know how WN came to be leaning or lying on the hood of a parked car. He did not remember ejaculating during the handjob he testified about on direct examination. Trial counsel asked Appellant if he put his penis inside of WN, and he replied, "I don't remember having sex, sir." Appellant did not remember a sedan driving by and honking its horn. Trial counsel asked if he knew how WN's pants and underwear got down around her ankles. Appellant answered, "I don't know, sir." Later, when confronted with evidence that he left WN on the hood of the car with her pants and underwear around her ankles, Appellant answered, "I didn't see that, sir." On redirect examination, Appellant acknowledged he had trouble remembering what happened that night because of the passage of time and because he was drunk that evening.

Before resting its case, the Defense called a witness who was qualified as an expert in forensic psychology. The expert testified that a person intoxicated to the point that they experience "black-outs" can continue to make decisions and appear normal to others. In such instances, the person may be able to perform tasks that are part of their implicit memories, such as the kinds of actions that person has repeatedly performed. However, he or she just may have no memory of it.

### 2. Law

#### a. Legal and Factual Sufficiency

A Court of Criminal Appeals may affirm only such findings of guilty "as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." Article 66(c), UCMJ, 10 U.S.C. § 866(c). "Article 66(c) requires the Courts of Criminal Appeals to conduct a *de novo* review of legal and factual sufficiency of the case." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). When examining the evidence in the light most favorable to the prosecution, "a rational factfinder[ ] could use his 'experience with people and events in weighing the probabilities' to infer beyond a reasonable doubt" that an element was proven. *United States v. Long*, 81 M.J. 362, 369 (C.A.A.F. 2021) (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)). As a result, an examination for legal sufficiency "involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

### b. Elements of the Charged Offense

As charged and convicted, Appellant's conduct was found to have violated Article 120(b)(3)(A), UCMJ, 10 U.S.C. § 920(b)(3)(A), which required the Prosecution to prove three elements beyond a reasonable doubt: (1) that on or about 12 October 2013 Appellant committed a sexual act upon WN by penetrating her vulva with his penis; (2) that WN was incapable of consenting to the sexual act due to impairment by an intoxicant, to wit: alcohol; and (3) that Appellant reasonably should have known of WN's impairment. *See* 2012 *MCM*, pt. IV, ¶ 45.b.(3)(f)(i)–(iii).[30]

With regard to consent, the statute explains that "[t]he term 'consent' means a freely given agreement to the conduct at issue by a competent person." *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), pt. IV, ¶ 45.a.(g)(8)(A). The statute further explains an "incompetent person cannot consent." 2016 *MCM*, pt. IV, ¶ 45.a.(g)(8)(B). As the military judge properly instructed, a person is "incapable of consenting" if, because of impairment by alcohol, she lacks the cognitive ability to appreciate the sexual conduct in question, or lacks the physical or mental ability to make or communicate a decision about whether she agreed to the conduct. *See United States v. Pease*, 74 M.J. 763, 770 (N.M. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 180 (C.A.A.F. 2016).

### 3. Analysis

Appellant argues his conviction is legally insufficient and urges the court to find his conviction factually insufficient as well. Appellant attacks the reliability of the evidence that Appellant penetrated WN's vulva with his penis. Appellant also challenges the evidence that WN was incapable of consenting due to impairment by alcohol and that he reasonably should have known of her impairment. At the same time, Appellant argues the investigation was so deficient as to fail to support the conviction beyond a reasonable doubt. Additionally, Appellant asserts the evidence falls short of proof that WN did not consent to the sexual act, and that the Prosecution failed to prove Appellant did not labor under a reasonable mistake of fact as to WN's consent.

We have considered these contentions, which repeat many of the Defense's assertions when Appellant defended the case at trial. Our review of the *legal* sufficiency of the conviction requires an examination of whether any rational

---

[30] The 2012 *MCM* included the statutory text of Article 120, UCMJ, 10 U.S.C. § 820, for offenses committed on or after 28 June 2012, but the elements first appeared in the 2016 *MCM* after Executive Order 13,740 was signed on 16 September 2016. *See* Exec. Order 13740, 81 Fed. Reg. 65175 (22 Sep. 2016). We conclude that the description of the elements in the 2016 *MCM* is the correct interpretation of Article 120(b)(3)(A), UCMJ, 10 U.S.C. § 920(b)(3)(A), at the time of the conduct charged in the specification.

trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 318–19; *Robinson*, 77 M.J. at 297–98. Our determination includes evaluating all reasonable inferences from the evidence in favor of the Prosecution. *Barner*, 56 M.J. at 134 (C.A.A.F. 2001).

A rational factfinder could find penetration from the DNA evidence and from witnesses who saw Appellant and WN in the parking garage. A rational factfinder could conclude that persuasive evidence of WN's incapacitation was shown by her testimony that she had no memory of the charged incident after she had been drinking alcohol. The testimony of witnesses who saw WN at the club and in the garage was sufficient proof that Appellant reasonably should have known of her impairment. In conjunction with this evidence, a rational factfinder could infer WN was incapable of consenting and that Appellant knew of her impairment from the video that showed her trying to open the door to the wrong car moments after the charged conduct. A rational factfinder could conclude that deficiencies in the investigation did not raise reasonable doubt. *See Jackson*, 443 U.S. at 326 (citing *Holland*, 348 U.S. at 140) (dismissing the theory that the prosecution must "rule out every hypothesis except that of guilt beyond a reasonable doubt" for a conviction to be found legally sufficient)).

Finally, we consider Appellant's claim that the Prosecution failed to prove beyond a reasonable doubt that Appellant did not have a reasonable mistake of fact as to WN's consent. "The defense of mistake of fact is an affirmative defense and a 'required instruction' under R.C.M. 920(e)(3)" when it is raised by the evidence. *United States v. Gutierrez*, 64 M.J. 374, 376 (C.A.A.F. 2007). Depending on the evidence presented at trial, an appellant's mistake of fact as to consent may be a defense to sexual assault. *See* R.C.M. 916(j)(1). The defense requires that an appellant, due to ignorance or mistake, incorrectly believe that another consented to the sexual conduct at issue. *See id.* To be a viable defense, the mistake of fact must have been honest and reasonable under all the circumstances. *See id.*; *see generally United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1998) (quoting *United States v. Willis*, 41 M.J. 435, 438 (C.A.A.F 1995)) (charge of rape).

The military judge did not instruct the members that they must consider this defense. After giving the members his final instructions, the military judge referred the Defense to the instructions checklist in the *Military Judges' Benchbook*. *See* Dept. of the Army Pamphlet 27-9, at App. I (10 Sep. 2014). The military judge asked trial defense counsel if he had "considered all the instructions listed in that appendix" and if he was "specifically waiving all instructions not given?" Trial defense counsel gave an affirmative response to both questions, thereby acquiescing to instructions that did not include the mistake of fact defense that Appellant relies on in his legal insufficiency claim for the first time on appeal.

We are dubious that the scope of the court's legal sufficiency review includes affirmative defenses that were not before the factfinder when it reached its verdict. Mistake of fact is an affirmative defense that can be waived even if it is reasonably raised by the evidence. *Gutierrez*, 64 M.J. at 376; *see id.* at 376 n.3 (observing that our superior court's "jurisprudence allows affirmative waiver of affirmative defenses"). Generally, "a legal theory not presented at trial may not be raised for the first time on appeal absent exigent circumstances." *United States v. Lloyd*, 69 M.J. 95, 101 (C.A.A.F. 2010) (citing *United States v. Bowers*, 14 C.M.R. 37 (C.M.A. 1954)). On this point, Appellant would have us decide as part of our legal sufficiency review whether a rational factfinder could have found a defense that the actual factfinder had not been instructed to consider. Relevant, too, Appellant does not challenge the military judge's findings instructions on appeal.

Even if we were disinclined to find waiver, we find that mistake of fact as to consent was not "in issue," R.C.M. 920(e)(3), here where the Prosecution proved beyond a reasonable doubt Appellant reasonably should have known of WN's impairment. *See United States v. Teague*, 75 M.J. 636, 638 (A. Ct. Crim. App. 2016) ("[I]f the government proves that an accused should have reasonably known that a victim was incapable of consenting, the [G]overnment has also proven any belief of the accused that the victim consented was unreasonable."); *see also United States v. Rich*, 79 M.J. 572, 587 (A.F. Ct. Crim. App. 2019) (en banc) (citing *Teague*, 75 M.J. at 638) ("[B]y proving the elements of the charged offense, the Government necessarily disproved the existence of either asserted mistake of fact."). The affirmative defense of mistake of fact as to consent under R.C.M. 916(j)(1) and 920(e)(3) was not a defense to the charged conduct. Accordingly, we decline to consider it as part of our legal sufficiency review.

The trial evidence legally supports Appellant's conviction even with the discrepancies noted by Appellant. Viewing the evidence in the light most favorable to the Prosecution, *Robinson*, 77 M.J. at 297–98, a rational factfinder could have found each element of the charged offense beyond a reasonable doubt. Therefore, the evidence is legally sufficient to support Appellant's conviction.

We then ask whether the evidence, although legally sufficient to support the conviction, is nevertheless unconvincing such that we are not persuaded of Appellant's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325. While the court has the independent authority and responsibility to weigh the credibility of the witnesses in determining factual sufficiency, we recognize that the trial court saw and heard the testimony. *See United States v. Moss*, 63 M.J. 233, 239 (C.A.A.F. 2006) (stating it is the members' role to determine whether testimony is credible or biased).

We find convincing proof of Appellant's guilt from WN's testimony, DNA evidence, the security camera recordings, and witnesses who observed Appellant's conduct and WN's inability to consent in the parking garage. Having weighed the evidence in the record and made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Accordingly, Appellant's conviction is not just legally sufficient, but factually sufficient as well.

## C. Timeliness of Appellate Review

### 1. Law

Whether an appellant has been deprived of his due process right to speedy post-trial and appellate review, and whether constitutional error is harmless beyond a reasonable doubt, are questions of law we review de novo. *United States v. Arriaga*, 70 M.J. 51, 56 (C.A.A.F. 2011) (citing *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006)).

A presumption of unreasonable delay arises when appellate review is not completed and a decision is not rendered within 18 months of the case being docketed. *Moreno*, 63 M.J. at 142. If there is a *Moreno*-based presumption of unreasonable delay or an otherwise facially unreasonable delay, we examine the matter under the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citations omitted). *Moreno* identified three types of prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of a convicted person's grounds for appeal and ability to present a defense at a rehearing. *Id.* at 138–39 (citations omitted).

"We analyze each factor and make a determination as to whether that factor favors the Government or [Appellant]." *Id.* at 136 (citation omitted). Then, we balance our analysis of the factors to determine whether a due process violation occurred. *Id.* (citing *Barker*, 407 U.S. at 533 ("Courts must still engage in a difficult and sensitive balancing process.")). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* (citation omitted). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Recognizing our authority under Article 66(c), UCMJ, we also consider if relief for excessive post-trial delay is appropriate even in the absence of a due

process violation. *See United States v. Tardif*, 57 M.J. 219, 221, 225 (C.A.A.F. 2002).

### 2. Analysis

After the rehearing, Appellant's case was docketed with the court on 13 September 2019. The overall delay in failing to render this decision within 18 months is facially unreasonable. *See Moreno*, 63 M.J. at 142. However, we determine no violation of Appellant's right to due process and a speedy appellate review. The reasons for the delay include the time required for Appellant to file his brief on 26 October 2020, and the Government to file its answer on 7 December 2020.

Analyzing the *Barker* factors, we find the delay is not excessively long under the circumstances. The court granted 11 enlargements of time for Appellant to prepare his brief in support of the assignments of error and issues raised by Appellant. Appellant manifested agreement to the tenth and eleventh enlargement requests. The court held three status conferences to discuss the progress of Appellant's case after granting a motion to withdraw submitted by Appellant's first appellate counsel. Some of the delay may be attributed to a change in Appellant's detailed appellate defense counsel six months after the case was docketed.[31] Appellant's case required counsel for both parties, and the court, to review a 31-volume record with 1,743 pages of transcript. There are 24 prosecution exhibits, 12 defense exhibits, and 130 appellate exhibits. Appellant's enlargement requests apprised the court of the length and complexity of the case, not least of which were Appellant's "complex allegations of unlawful command influence."

The court affirms the findings and sentence in this case after examining assertions of error that occurred at trial and sentencing. However, Appellant has not asserted his right to speedy appellate review or pointed to any particular prejudice resulting from the presumptively unreasonable delay, and we find none. Finding no *Barker* prejudice, we also find the delay is not so egregious that it "adversely affects the public's perception of the fairness and integrity of the military justice system." *See Toohey*, 63 M.J. at 362. As a result, there is no due process violation. *See id.*

---

[31] The first status conference was held on 13 March 2020 to discuss a motion to withdraw submitted by CAPT Mizer, which the court granted on 18 March 2020. CAPT Mizer was detailed to represent Appellant in February 2018 in his civilian capacity and the motion was submitted over Appellant's objection. CAPT Mizer received active-duty recall orders in March 2018 and commenced an active-duty tour in May 2018. In February 2020, CAPT Mizer was placed on indefinite active-duty orders and was required to report in March 2020.

In addition, we determine that Appellant is not due relief even in the absence of a due process violation. *See Tardif*, 57 M.J. at 223–24. Applying the factors articulated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we find the delay in appellate review justified and relief for Appellant unwarranted.

## III. CONCLUSION

The approved findings and sentence from the rehearing are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court